### BOSTON HIDES & FURS, LTD., Plaintiff,

v.

### The SUMITOMO BANK, LIMITED, Suelas Villegas, S.A. de C.V., and Banco Nacional De Mexico, S.A., Defendants.

### CA No. 93–11933–JLT.

United States District Court, D. Massachusetts.

Nov. 29, 1994.

---

Erich R. Luschei, Boston, MA, Dustin F. Hecker, Posternak, Blankstein & Lund, Boston, MA, Cornelius J. Chapman, Jr., McDermott, Will & Emery, Boston, MA, for Boston Hides & Furs, Ltd.

David B. Chaffin, Pasquale J. D'Orsi, Hare & Chaffin, Boston, MA, for The Sumitomo Bank, Ltd.

Joseph C. Marrow, Hutchins & Wheeler, Boston, MA, Michael R. Gordon, Reid & Priest, New York City, Richard J. Yurko, Hutchins, Wheeler & Dittmar, Boston, MA, for Banco Nacional De Mexico, S.A.

### MEMORANDUM

TAURO, Chief Judge.

The present breach of contract and unfair or deceptive trade practice action arises out of the defendant banks' dishonor of a letter of credit issued in favor of plaintiff Boston Hides & Furs, Ltd. ("Boston Hides"). Presently before the court are the plaintiff's motion for partial summary judgment and the banks' cross-motion for summary judgment.

### I.

*Background*

In late May, 1992, plaintiff Boston Hides contracted to supply defendant Suelas Villegas, S.A. de C.V. (the "Buyer") with cowhides in Laredo, Texas for $185,300.00. Pursuant to this contract, on June 4, 1992 defendant Banco Nacional de Mexico, S.A. ("Banamex") issued a letter of credit (the "Letter of Credit") in favor of Boston Hides for the Buyer's account in the approximate amount of $175,000.00. Defendant Sumitomo Bank, Ltd. ("Sumitomo") confirmed the Letter of Credit by advice dated June 5, 1992.

In order to receive payment under the Letter of Credit, Boston Hides was required to present the following documents:

CLEAN TRUCK BILL OF LADING, PLUS ONE NON–NEGOTIABLE COPY CONSIGNED TO [BANAMEX] MARKED NOTIFY TO MONE COMPANY, INC., 1902 FRANKFORT P.O. BOX

876, LAREDO, TEXAS 78040 U.S.A., AND SHOWING FREIGHT PREPAID. ORIGINAL AND 2 COPIES SIGNED COMMERCIAL INVOICE.

The Letter of Credit also specified "C. AND F. LAREDO, TEXAS, U.S.A." and indicated that it was subject to The Uniform Customs and Practice for Documentary Credits (1983 Revision), International Chamber of Commerce Publication Number 400. THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS (1983 Revision), INTERNATIONAL CHAMBER OF COMMERCE PUBLICATION NUMBER 400 (1983) (the "1983 U.C.P.").

On June 17, 1992, Boston Hides, through its collecting bank, State Street Bank and Trust Company ("State Street Bank"), made presentment to Sumitomo's branch office in New York, seeking payment on the Letter of Credit. Boston Hide's presentment included one commercial invoice, covering shipment of six trailer-loads of cowhides to Laredo, Texas with an aggregate value of $185,300.00 (the "Invoice"), and six bills of lading (the "Presentment Bills of Lading").

Sumitomo, and ultimately Banamex, (collectively, the "Banks"), however, refused to honor payment under the Letter of Credit. In support of its dishonor, Sumitomo cited a discrepancy between the identification number of a trailer used to ship one of the six cowhide loads, as contained in one of the Presentment Bills of Lading (the "Bill of Lading"), and the identification number for that same trailer contained in the Invoice.[1] Boston Hides received notice of the rejected presentation from Sumitomo on June 18, 1992. Although Boston Hides did have until the following day to submit corrected documents, they did not do so. Subsequently, Banamex called the Buyer to get a waiver of the discrepancy. The Buyer, however, refused to provide such a waiver, and Boston Hides was never paid.

Boston Hides commenced the present action on September 2, 1993. It asserted separate breach of contract claims against Sumitomo and Banamex (Counts I and II), separate Massachusetts General Laws, Chapter 93A unfair or deceptive trade practice claims against Banamex and Buyer (Count III and VI), and, lastly, a breach of contract claim against Buyer (Count IV). In defending this suit, however, the Banks uncovered information which suggests Boston Hides' presentment included false documents. The relevant facts, reconstructed from various shipping documents, are as follows.

Boston Hides shipped the cowhides to Laredo prior to any agreement to secure a letter of credit. (Plaintiff's Memo in Opposition to Defendant's Motion for Summary Judgment at 22). Pursuant to the cowhide shipment, the freight company issued several bills of lading. These bills of lading, (the "Original Bills of Lading"), consigned the cowhides to Andres Monetou C/O Boston Hides & Furs LTD. Then, only after shipment was complete did the parties contemplate a letter of credit. As a condition to its release of the cowhides, Boston Hides demanded that the Buyer procure the Letter of Credit in its favor. (Plaintiff's Memo in Opposition to Defendant's Motion for Summary Judgment at 22).

On June 4, 1992, at the Buyer's request, Banamex issued the Letter of Credit in favor of Boston Hides. Then, on June 5, 1992, Boston Hides released the cowhides to the Buyer. Having delivered the goods, Boston Hides sought payment under the Letter of Credit. But, because the Original Bills of Lading consigned the goods to Andres Monetou C/O Boston Hides, instead of to Banamex as required under the Letter of Credit, they would not satisfy presentment. Apparently, Boston Hides then created the Presentment Bills of Lading, indicating consignment to Banamex, to comply with the terms of the Letter of Credit. The Banks maintain that this discrepancy between the Original and Presentment Bills of Lading confirms that the Presentment Bills of Lading were false, justifying dishonor.

Informed by these facts, the court now considers Boston Hides' and the Banks' cross-motions for summary judgment on Counts I and II and III.

---

1. The Invoice referred to the trailer as "TRLR # 65024 SEAL # 04389" while the Bill of Lading referred to the trailer as "TRLR # 650524 SEAL # 04389."

## II.

### Choice–of–Law

Plaintiff contends that, in resolving this dispute, the court should apply Massachusetts law, the law of the forum. The Banks maintain, however, that New York law, the law of the place of performance, governs. Before moving to the merits, the court must address this choice-of-law issue.

■ Federal diversity courts apply the choice-of-law principles of their forum state. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Accordingly, in the present diversity action, this court will apply Massachusetts choice-of-law rules.

■ Although Massachusetts does not "tie [its] conflicts law to any specific choice-of-law doctrine," the State has turned away from the rigid, single factor analysis, exemplified by the first RESTATEMENT OF CONFLICT OF LAWS (1934), in favor of a more "functional" approach. *Bushkin Associates, Inc. v. Raytheon Co.*, 393 Mass. 622, 473 N.E.2d 662, 668 (1985). Accordingly, Massachusetts considers "various choice influencing considerations" in making its choice-of-law determination. *Bushkin Associates*, 473 N.E.2d at 668.

■ Under modern conflicts-of-law theory, where there is a "false conflict" such that the "laws of both states relevant to the set of facts are the same, or would produce the same decision in the lawsuit, there is no real conflict between them." R.A. LEFLAR, AMERICAN CONFLICTS OF LAW § 92 (4th ed. 1986). In such a case, the "case ought to be decided under the law that is common to both states." R.A. LEFLAR, AMERICAN CONFLICTS OF LAW § 92 (4th ed. 1986). Because neither party identifies a relevant conflict between these States' laws, and the appropriate legal analysis is essentially equivalent under both, the court will apply Massachusetts law, the law of the forum state, to the extent it is common to both New York and Massachusetts.

## III.

### Standard for Summary Judgment

The standard for summary judgment in this circuit is well known. "Summary judgment is warranted where the record, viewed in the light most favorable to the nonmoving party, reveals that there is no genuine factual dispute and the moving party [is] entitled to judgment as a matter of law." *Siegal v. American Honda Motor Co.*, 921 F.2d 15, 17 (1st Cir.1990); Fed.R.Civ.P. 56(c). "The moving party is entitled to judgment as a matter of law if the nonmoving party does not adduce enough evidence to permit a reasonable trier of fact to find for the nonmoving party on any element essential to its claim." *Milton v. Van Dorn Co.*, 961 F.2d 965, 969 (1st Cir.1992).

Guided by this standard, the court now addresses the parties' cross-motions for summary judgment.

## IV.

### Analysis

A. *Banks' Refusal to Pay under the Letter of Credit (Cross–Motions for Summary Judgment on Breach of Contract Claims)*

The parties' claims for summary judgment under Counts I and II hinge on two contested issues: (1) whether the trailer number inconsistency between the Bill of Lading and Invoice in plaintiff's presentment justified the Banks' refusal to pay under the Letter of Credit, and (2) whether the plaintiff's submission of the Presentment Bills of Lading as opposed to the Original Bills of Lading justified the Banks' refusal to pay under the Letter of Credit. The court will address each issue in turn.

1. *Inconsistency Between Presentment Documents*

■ Generally, a demand for payment under a letter of credit must strictly comply with the letter of credit's terms. *Exotic Traders Far East Buying Office v. Exotic Trading U.S.A., Inc.*, 717 F.Supp. 14, 16 (D.Mass.1989) (citing *Banco Espanol de Credito v. State Street Bank & Trust Co.*, 385

F.2d 230, 237 (1st Cir.1967), *cert. denied,* 390 U.S. 1013, 88 S.Ct. 1263, 20 L.Ed.2d 163 (1968)). Accordingly, where presentment documents are not exactly as specified in the letter of credit, demand may be rejected.

Discrepancies between the presentment documents themselves, as opposed to between the presentment documents and the letter of credit, are also subject to this strict compliance principle. Pursuant to the 1983 U.C.P., a bank may refuse payment under a letter of credit where the presentment documents submitted are facially inconsistent. THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS (1983 Revision), INTERNATIONAL CHAMBER OF COMMERCE PUBLICATION NUMBER 400, Article 15 (1983). Such facially inconsistent presentment documents are treated as if they fail to meet the terms of the letter of credit. THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS (1983 Revision), INTERNATIONAL CHAMBER OF COMMERCE PUBLICATION NUMBER 400, Article 15 (1983).[2]

This general rule of strict compliance, however, has been moderately tempered. A bank may not dishonor payment based on a "hypertechnical reading" of the letter of credit. *Exotic Traders,* 717 F.Supp. at 16. Instead, "a variance between documents specified and documents submitted is not fatal if there is *no* possibility that the documents could mislead the paying bank to its detriment." *Flagship Cruises, Ltd. v. New England Merchants Nat. Bank of Boston,* 569 F.2d 699, 705 (1st Cir.1978); *See also Beyene v. Irving Trust Co.,* 762 F.2d 4, 6 (2d Cir.1985).

The Banks do not contest the fact that Boston Hides' presentment facially conformed to the Letter of Credit's requirements.[3] Instead, focusing on the internal trailer number discrepancy between the Invoice and the Bill of Lading, the Banks claim that this variance justified dishonor. The court, however, disagrees. The inconsistent trailer numbers were a "technical variance," *Exotic Traders,* 717 F.Supp. at 16; *See Banco Espanol de Credito v. State Street Bank & Trust Co.,* 385 F.2d 230 (1st Cir.1967), *cert. denied,* 390 U.S. 1013, 88 S.Ct. 1263, 20 L.Ed.2d 163 (1968); *Flagship Cruises,* 569 F.2d at 705, regarding a matter which was not required under the terms of the Letter of Credit and which could not mislead the Banks to their detriment.[4]

The Banks' principal argument is that, "if the 'marks and numbers' identifying the goods on the [Presentment Bills of Lading] did not match the 'marks and numbers' that identified the goods in possession of the freight forwarder or other custodian, there would be a clear risk that [the Banks'] claiming of the goods could have been prevented altogether or materially delayed." (Memo-

---

**2.** 1983 U.C.P., Article 15 specifies that "[d]ocuments that appear, on their face, to be inconsistent with one another will be considered as not appearing, on their face, to be in accordance with the terms of the letter of credit." THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS (1983 Revision), INTERNATIONAL CHAMBER OF COMMERCE PUBLICATION NUMBER 400, Article 15 (1983).

**3.** The Letter of Credit requires only a "clean truck bill of lading, plus one non-negotiable copy consigned to [Banamex]" and "original and 2 copies of signed commercial invoice." Boston Hides, through State Street Bank, submitted documents to Sumitomo which facially met these requirements on June 17, 1992.

**4.** In *Banco Espanol,* the court held that a certificate stating the goods were found "conforming to the conditions stipulated in the order-stock sheets" complied with the letter of credit's re-

quirement of a certificate stating "the goods were in conformity with the order." *Banco Espanol,* 385 F.2d at 233–34. In *Flagship Cruises,* the court held that dishonor was not proper simply because (1) the draft was drawn by the wrong entity, (2) the draft did not contain a statement that the draft was in conjunction with certain collateral documents required by the credit, and (3) the draft did not say it was drawn under "NEMNB Credit No. 18506" but rather simply identified "No. 18506." *Flagship Cruises,* 569 F.2d at 705. Finally, in *Exotic Traders,* the court held that the defendant bank wrongly dishonored where telexes necessary for presentment (1) were dated one day after, rather than one day prior to, shipment, and (2) were F.O.B. Korea as opposed to F.O.B. Seoul. *Exotic Traders,* 717 F.Supp. at 17.

The court believes that the inconsistent trailer numbers in the present case fall within the scope articulated for allowable variances in the above cases.

randum in Support of Motion of Banks for Summary Judgment at 30). Accordingly, they maintain that the trailer number variance was a material discrepancy which threatened their security interest and, consequently, their ability to recover from the Buyer. This argument, however, ignores several important facts and is not supported by the relevant case law.

First, the Letter of Credit did not even require "marks and numbers" be included on the Bill of Lading or Invoice. Where Boston Hides' presentment would have been acceptable absent these "marks and numbers," the court is unwilling to conclude that a minor, typographical error in such voluntarily included description defeats compliance.[5]

Moreover, despite any confusion created by the single numerical discrepancy in the trailer numbers, the Bill of Lading and Invoice did contain identical seal numbers, weights and numbers of pieces. The Banks could have resolved the slight trailer number inconsistency by reference to these other numbers on the face of the documents, and thereby recovered the goods.

### 2. *Presentment of False Documents*

Despite the court's holding that the Banks' inconsistent trailer number dishonor was improper, the Banks are nonetheless justified in refusing payment because of the plaintiff's presentment of false documents.

The plaintiff admits that the Presentment Bills of Lading were "substitute" and not "original." These "substitute" Presentment Bills of Lading contained information which differed from the facts as contained in the actual shipping documents. In particular, the Original Bills of Lading specified consignment to parties other than Banamex as well as different shipment dates and shipment by a party other than Boston Hides. The Banks assert that these "substitute" Presentment Bills of Lading are therefore false and fraudulent. They argue that by presenting documents that were not genuine, even if they had been conforming on their face, the plaintiff breached conditions of the Letter of Credit, relieving the Banks of any obligation to pay.[6]

---

5. Cases cited by the Banks in which courts have justified dishonor are distinguishable along these grounds. Each regards a discrepancy related to an express requirement under a letter of credit which apparently could not be resolved on the face of the documents.

In *Mueller Co. v. South Shore Bank*, 991 F.2d 14 (1st Cir.1993), the letter of credit specified that sight draft for payment was to be accompanied by invoices indicating order and shipment after a certain date. The court held dishonor justified where many of the invoices submitted had order dates prior to the indicated date, directly contrary to the letter of credit's requirements. In *Beyene*, 762 F.2d at 7, the court held that the bill of lading's misspelling of the notice party's name—"Sofan" as "Soran"—was a material discrepancy entitling the bank to refuse to honor the letter, since the plaintiffs did not claim that the names would be recognized as obvious misspellings of each other. The Letter of Credit in the present case, unlike those in *Mueller* and *Beyene*, never specified any particulars required under the Presentment Bills of Lading and Invoices. Hence, the inconsistent trailer numbers were not a direct violation.

Even courts considering discrepancies between presentment documents upheld dishonor only where such discrepancies were also related to a required term of the letter of credit. *See Voest–Alpine Intern. Corp. v. Chase Manhattan Bank, N.A.*, 545 F.Supp. 301 (S.D.N.Y.1982), *aff'd in part, rev'd in part*, 707 F.2d 680 (2d Cir.1983).

For example, in *Voest–Alpine*, the letter of credit required "on board bills of lading evidencing current shipment dated no later than January 31, 1981" as well as certificates of inspection and weight. *Voest–Alpine*, 545 F.Supp. at 302. The court found dishonor justified where the certificates of inspection and weight included a loading date other than the January 31, 1981 date indicated on the bills of lading. In the present case, the Letter of Credit never specified that the Presentment Bills of Lading or Invoice should include trailer numbers. Thus, although there was a discrepancy between trailer numbers, the discrepancy did not relate to an explicit provision of the Letter of Credit as in *Voest–Alpine*.

6. The Banks raised their fraud defense for the first time on summary judgment. This is somewhat problematic. Fraud is an affirmative defense in a suit for wrongful dishonor. Fed. R.Civ.P. 8(c); *See Ward Petroleum Corp. v. Federal Deposit Ins. Corp.*, 903 F.2d 1297, 1301 (10th Cir.1990). Generally, failure to plead an affirmative defense results in its waiver and exclusion from the case. 5 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 1278 (1990). This rule, however, is not absolute.

The purpose of Fed.R.Civ.P. 8(c) is to give the opposing party notice of the affirmative defense and a chance to rebut it. *Blonder–Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 350, 91 S.Ct. 1434, 1453, 28

In opposition to these arguments, the plaintiff asserts that (1) the Banks are precluded from raising fraud as a ground for dishonor, and (2) in any case, its actions did not amount to fraud. The court will address each argument in turn.

### i. *Preclusion*

The plaintiff claims that under Article 16 of the 1983 U.C.P., the Banks are precluded from raising any defects to justify dishonor other than those which they identified without delay after examining the documents.[7] Because the defects in the Presentment Bills of Lading were not identified until approximately two years after dishonor, the plaintiff maintains that the Banks may not presently rely on these defects to deny payment. Plaintiff also claims that the independence principle precludes the Banks from going beyond the face of the presentment documents to uncover the asserted fraud. The court disagrees on both points.

Article 16 of the 1983 U.C.P. provides that an issuing bank must examine a beneficiary's documents within a "reasonable time" and notify the remitting bank, "without delay," of any "discrepancies" on which the bank bases dishonor. THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS (1983 Revision), INTERNATIONAL CHAMBER OF COMMERCE PUBLICATION NUMBER 400, Article 16(c), (d) (1983).[8] If the issuer fails to meet any of these requirements, it is precluded from asserting the discrepancies. THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS (1983 Revision), INTERNATIONAL CHAMBER OF COMMERCE PUBLICATION NUMBER 400, Article 16(e) (1983).[9] Article 16's preclusion provisions, do not, however, relate to the "effect, if any, of delay on the assertion of a forgery or fraud claim or defense." James G. Barnes, *Nonconforming Presentations Under Letters of Credit: Preclusion and Final Payment*, 56 BROOK. L.REV. 103, 103–104 n. 3 (1990); *See Prutscher v. Fidelity Intern. Bank*, 502 F.Supp. 535, 537 (S.D.N.Y.1980) ("[i]t seems clear, however, that UCC 5–114(2), and not the U.C.P., states the law concerning false and fraudulent documents in letter of credit

L.Ed.2d 788 (1971). If the plaintiff receives notice of an affirmative defense other than through the pleadings, the defendants' failure to comply with Fed.R.Civ.P. 8(c) does not cause the plaintiff any prejudice. *Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1445 (6th Cir.1993). ·

Although the Banks did raise their fraud defense for the first time on summary judgment, the Banks could not have raised the defense in their answer, since they did not discover information suggesting fraud until after almost a year of discovery. Because the plaintiff has not been prejudiced, having had adequate time to prepare and respond to the Banks' allegations on summary judgment, the court refuses to exclude the Banks' fraud claim.

7. In dishonoring presentment, the Banks relied solely on the trailer number discrepancy.

8. Article 16(c), (d) of the 1983 U.C.P. provides:

(c) The issuing bank shall have a reasonable time in which to examine the documents and determine, as above, whether to take up or refuse the documents.
(d) If the issuing bank decides to refuse the documents, it must give notice to that effect, without delay, by telecommunication or, if that is not possible, by other expeditious

means, to the bank from which it received the documents (the remitting bank), or to the beneficiary if it received the documents directly from him. Such notice must state the discrepancies in respect of which the issuing bank refuses the documents and also must state whether it is holding the documents at the disposal of, or is returning them to, the presenter (remitting bank or the beneficiary, as the case may be). The issuing bank then shall be entitled to claim from the remitting bank refund of any reimbursement that may have been made to that bank.

THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS (1983 Revision), INTERNATIONAL CHAMBER OF COMMERCE PUBLICATION NUMBER 400, Article 16(c), (d) (1983).

9. 1983 U.C.P., Article 16(e) provides:

(e) If the issuing bank fails to act in accordance with the provisions of paragraphs (c) and (d) of this article and/or fails to hold the documents at the disposal of, or to return them to, the presenter, the issuing bank shall be precluded from claiming that the documents are not in accordance with the terms and conditions of the credit.

THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS (1983 Revi-

transactions").[10] To the contrary, they are concerned with documentary compliance.

This interpretation of Article 16's preclusion provisions is supported by relevant caselaw as well as by Article 16's underlying policy rationale. In *American National Bank and Trust Co. of Chicago v. Hamilton Industries Intern., Inc.*, 583 F.Supp. 164 (N.D.Ill.1984), *rev'd on other grounds sub nom. Banque Paribas v. Hamilton Industries Intern., Inc.*, 767 F.2d 380 (7th Cir. 1985), the Northern District of Illinois permitted an issuer to raise a fraud defense to payment under a letter of credit even though the issuer failed to do so at the time of dishonor.[11] In so ruling, the court held that "a party who has knowingly submitted false documents to the issuer presents a classic case of a party with unclean hands." *Id.* at 172. The equitable remedies of estoppel and waiver were not available to the confirming bank. *Id.* at 172.

■ Boston Hides presents a similar case of "unclean hands," at odds with the rationale of 1983 U.C.P., Article 16. Preclusion under Article 16 is designed to both balance the beneficiary's obligation of strict compliance under a letter of credit and give the beneficiary prompt notice of defects so it can cure them. *Bank of Cochin Ltd. v. Manufacturers Hanover Trust Co.*, 612 F.Supp. 1533, 1541–42 (S.D.N.Y.1985), *aff'd* 808 F.2d 209 (2d Cir.1986). It is, in a sense, punishment for an issuer's failure to timely meet its obligations under the letter of credit. *Bank of Cochin*, 808 F.2d at 212. Where a beneficiary submits false documents, however, the defect is latent, not apparent from the face of the material presented. *See Semetex Corp. v. UBAF Arab American Bank*, 853 F.Supp. 759, 772 (S.D.N.Y.1994). To preclude the Banks for failure to assert such an intentional "discrepancy" which they could not have discovered "without delay" would improperly punish them for Boston Hides' wrongful conduct and not for their own error. Although the court is hesitant in allowing assertion of a defense to payment nearly two years after dishonor, the letter of credit's function as a "swift, fluid and reliable financing device" would not be promoted by sanctioning the submission of false documents. *Bank of Cochin*, 612 F.Supp. at 1543.

■ Furthermore, the independence principle does not command this court to reach a contrary result. It is a fundamental tenet of letter of credit law that, in commercial letter of credit transactions, banks deal in documents and not merchandise. HENRY HARFIELD, BANK CREDITS AND ACCEPTANCES, 71 (1974). Accordingly, letters of credit are treated as entirely separate and distinct from the underlying sales contract. HENRY HARFIELD, BANK CREDITS AND ACCEPTANCES, 71 (1974). This is called the independence principle.

---

sion), INTERNATIONAL CHAMBER OF COMMERCE PUBLICATION NUMBER 400, Article 16(e) (1983).

10. *Prutscher* was decided under the 1974 version of the U.C.P. Although 1983 U.C.P., Article 16's preclusion doctrine did intend to discourage subsequent notice of additional discrepancies, plaintiff has not identified any authority indicating it also intended to bring fraud within the U.C.P.'s scope, where fraud was not covered in the past.

11. The plaintiff attempts to distinguish *American National Bank* on the grounds that the case was reversed on appeal, decided prior to the 1983 U.C.P., and involved fraud in the transaction. These arguments, however, do not detract from *American National Bank's* relevant holding.

First, although the seventh circuit did reverse in *Banque Paribas v. Hamilton Industries Intern., Inc.*, 767 F.2d 380 (7th Cir.1985), it did not disturb the district court's preclusion holding.

Instead, it questioned the district court's threshold determination that there was fraud.

Furthermore, although the 1974 U.C.P., and not the 1983 U.C.P., was in effect at the time of *American National Bank*, the 1983 U.C.P. did not disturb the law's approach to fraud. Article 16(e) of the 1983 U.C.P. strengthened preclusion by making explicit what was implicit in Article 8(f) of the 1974 U.C.P.: that the issuer which fails to notify the beneficiary or presenting bank of defects promptly loses the right to raise those defects as a defense in an action for wrongful dishonor. *See Bank of Cochin, Ltd. v. Manufacturer Hanover Trust Co.*, 808 F.2d 209, 212 n. 2 (2d Cir.1986). The plaintiff fails to cite any authority which indicates that the 1983 revision also intended to extend the U.C.P.'s preclusive effect to fraud.

Finally, *American National Bank* involved the submission of false documentation, as in the present case, and did not concern fraud in the transaction.

In the present case, the Banks claim that Boston Hides' presentment of false documents undermined the Letter of Credit transaction, depriving them of their security interest in the goods by consignment to parties other than Banamex. This allegation refers exclusively to the Letter of Credit transaction and is not dependent on performance of the underlying contract. Accordingly, the independence principle, as described above, is not a bar to the Banks' assertion of fraud.[12]

Now, having determined that the Banks are not precluded from raising fraud as a defense to payment under the Letter of Credit, the court considers the merits of the fraud claim.

### ii. *Fraud in the Documents*

Under Section 5–114(2) of the Uniform Commercial Code, a court of appropriate jurisdiction may enjoin honor or uphold dishonor by an issuing bank where the bank has been advised that documents submitted pursuant to a letter of credit are fraudulent.[13] Mass.Gen.Laws Ann. ch. 106, § 5–114(2) (West 1990).[14] In addition, if sufficient evidence exists on which a court of appropriate jurisdiction could enjoin honor, the issuing bank, on its own initiative, may refuse payment. *Roman Ceramics Corp. v. Peoples Nat. Bank,* 714 F.2d 1207, 1213 (3d Cir.1983).[15]

The plaintiff does not deny that the Original Bills of Lading specify consignment to Andres Monetou, not to Banamex. Accordingly, Boston Hides failed to comply with an express condition of the Letter of Credit, and the Presentment Bills of Lading submitted to establish compliance were false. This misrepresentation was significant to the Letter of Credit transaction. In particular, consignment to other than Banamex deprived Banamex of its security interest in the goods and the leverage to secure payment from the Buyer, who had already received the cowhides pursuant to the Original Bills of Lading. The Banks' refusal to pay under the letter of credit was therefore justified pursuant to U.C.C. § 5–114(2). *See Prutscher v.*

Accordingly, for the purposes cited herein, *American National Bank* is still valid authority.

12. Finally, although the plaintiff asserts that the Banks do not have standing to raise the fraud defense, it submits no authority which establishes this proposition.

13. Application of Uniform Commercial Code Section 5–114(2), U.C.C. § 5–114(2) (1977), does not conflict with this court's prior determination that Massachusetts and New York law, as applied to the present case, are essentially equivalent.

It is well established that under New York law, where the parties have provided that a letter of credit is subject to the U.C.P., the U.C.P. controls. *United Bank Ltd. v. Cambridge Sporting Goods Corp,* 41 N.Y.2d 254, 392 N.Y.S.2d 265, 269 n. 2, 360 N.E.2d 943, 947 n. 2 (1976). But, in such cases where the U.C.P. is silent or ambiguous, an analogous provision of the New York Uniform Commercial Code may be utilized, as long as it is consistent with the U.C.P. *Bank of Cochin,* 612 F.Supp. at 1542. Because the 1983 U.C.P. is not in conflict, nor does it regard the subject matter of U.C.C. § 5–114(2), it does not bar application of this section as adopted by New York. N.Y.U.C.C. § 5–114(2) (McKinney 1991). Accordingly, Massachusetts and New York law both rely on Uniform Commercial Code Section 5–114(2) in their approach to fraud.

14. U.C.C. § 5–114(2) states, in relevant part:
(2) Unless otherwise agreed when documents appear on their face to comply with the terms of a credit but a required document does not in fact conform to the warranties made on negotiation or transfer of a document of title (Section 7–507) or of a certificated security (Section 8–306) or is forged or fraudulent or there is fraud in the transaction: ...
(b) ... an issuer acting in good faith may honor the draft or demand for payment despite notification from the customer of fraud, forgery or other defect not apparent on the face of the documents but a court of appropriate jurisdiction may enjoin such honor.
Mass.Gen.Laws Ann. ch. 106, § 5–114(2) (West 1990).

15. Plaintiff argues that the fraud exception to an issuer's duty to honor facially conforming presentment applies only "to situations in which the wrongdoing of the beneficiary has permeated the entire transaction...." *Ultra Scope v. ExteBank,* 158 Misc.2d 117, 599 N.Y.S.2d 361, 366 (N.Y.Sup.Ct.1992), *app. denied,* 82 N.Y.2d 655, 602 N.Y.S.2d 803, 622 N.E.2d 304 (1993); *See Ground Air Transfer, Inc. v. Westates Airlines, Inc.,* 899 F.2d 1269, 1273 (1st Cir.1990) (fraud exception applies in those cases "where the beneficiary's conduct has so vitiated the entire transaction that the legitimate purposes of the independence of the issuer's obligations would no longer be served") (internal citations omitted). This standard, however, looks to the underlying contract and applies to the defense of fraud in the transaction, not fraud in the documents. *See Airline Reporting Co. v. First Nat. Bank of Holly*

*Fidelity International,* 502 F.Supp. 535 (S.D.N.Y.1980). Presentation of fraudulent documents to a bank by a beneficiary subverts the letter of credit's ability to serve as a reliable payment mechanism. *Voest–Alpine Intern. Corp. v. Chase Manhattan Bank, N.A.,* 707 F.2d 680, 686 (2d Cir.1983). "Falsified documents are the same as no documents at all." *Id.* at 686.

The plaintiff attempts to mitigate the strength of the Banks' argument, claiming that (1) "substitute" bills of lading, such as the Presentment Bills of Lading, are expressly authorized by U.C.C. § 7–402, and (2) that Banamex maintained a valid security interest in the goods under the "substitute" Presentment Bills of Lading pursuant to U.C.C. § 9–304(3), (5). Neither argument, however, withstands analysis.

 U.C.C. § 7–402 recognizes that documents which cover the same goods but have different issuers, such as the Presentment Bills of Lading and the Original Bills of Lading in the present case, may be effective to transfer title. Mass.Gen.Laws Ann. ch. 106, § 7–402, Uniform Commercial Code Comment 3 (West 1990).[16] This Section, however, does not sanction "substitute" documents containing false information, designed to meet the terms of a Letter of Credit and created after the goods had been delivered to their buyer, as in the present case. Rather, the duplicate document transactions envi-

sioned involve a warehouse receipt issued by the warehouseman and a subsequent delivery order issued by the holder of the receipt, or a freight forwarder's bill and a subsequent railroad bill issued to the forwarder. Mass.Gen. Laws Ann. ch. 106, § 7–402, Uniform Commercial Code Comment (West 1990).

 Furthermore, Banamex did not acquire a perfected security interest pursuant to U.C.C. § 9–304(3), (5) as a result of the Presentment Bills of Lading's consignment to Banamex. U.C.C. § 9–304(3) provides that when goods are in the possession of a "bailee" who has not executed a negotiable document for the goods, a security interest in the goods is perfected by (1) issuance of a document in the name of the secured party, (2) the bailee's receipt of notice of the secured party's interest, or (3) filing of a financing statement as to the goods. Mass. Gen.Laws Ann. ch. 106, § 9–304(3) (West 1990).[17] In the present case, the goods were in the Buyer's possession at the time Boston Hides "issued" the Presentment Bills of Lading naming consignment to Banamex. Because the Buyer is not a "bailee" within the contemplation of the U.C.C.[18], Banamex would not have a perfected security interest under this provision, even if it had received the Presentment Bills of Lading from Sumitomo.

In view of the falsity of the Presentment Bills of Lading, this court holds dishonor was proper.

---

*Hill,* 832 F.2d 823, 828 (4th Cir.1987). Accordingly, it is inapplicable in the present case.

16. U.C.C. § 7–402 provides that, where the same issuer issues "duplicate" or "overissue" documents, the holder of such documents has no rights in the goods except in limited circumstances. Mass.Gen.Laws Ann. ch. 106, § 7–402 (West 1990). An issuer who fails to mark a duplicate as such or makes an overissue of documents is liable for resulting damages. Mass.Gen. Laws Ann. ch. 106, § 7–402 (West 1990). Uniform Commercial Code Comment 3, however, goes on to specify:

> Overissue is defined so as to exclude the common situation where two valid documents of different issuers are outstanding for the same goods at the same time ... In these cases dealings with the subsequently issued documents may be effective to transfer title.

Mass.Gen.Laws Ann. ch. 106, § 7–402, Uniform Commercial Code Comment 3 (West 1990).

17. U.C.C. § 9–304(3) provides:

> A security interest in goods in the possession of a bailee other than one who has issued a negotiable document therefor is perfected by issuance of a document in the name of the secured party or by the bailee's receipt of notification of the secured party's interest or by filing as to the goods.

Mass.Gen.Laws Ann. ch. 106, § 9–304(3) (West 1990).

18. U.C.C. § 7–102(a) defines a "bailee" for purposes of Article 7 of the U.C.C. as follows: "the person who by a warehouse receipt, bill of lading or other document of title acknowledges possession of goods and contracts to deliver them." Mass.Gen.Laws Ann. ch. 106, § 7–102(a) (West 1990). The court adopts this definition for guidance in the present situation.

> Because the Buyer was a purchaser of goods and not one who "contracts to deliver them," it was not a "bailee" under U.C.C. § 9–304(3). Mass.Gen.Laws Ann. ch. 106, § 7–102(a) (West 1990).

B. *Chapter 93A Claim (Banks' Motion for Summary Judgment on Count III)*

In Count III of its complaint, plaintiff claims that Banamex's refusal to honor the Letter of Credit constituted an unfair or deceptive trade practice in violation of Massachusetts General Laws Chapter 93A, Section 11. The Banks now move for summary judgment, asserting that the actions constituting the alleged unfair or deceptive act did not occur "primarily and substantially" in Massachusetts. The court agrees.

To maintain an action under Chapter 93A, Section 11, the unfair or deceptive act or practice must have "occurred primarily and substantially within the commonwealth." Mass.Gen.Laws Ann. ch. 93A, § 11 (West 1984 & Supp.1994).[19] Although the statute does not define what constitutes actions occurring "primarily and substantially" in Massachusetts, the courts of the commonwealth have addressed the meaning of this language several times.

Initially, Massachusetts courts focussed on the "place of injury" in making the "primarily and substantially" determination.[20] Later courts, however, questioned this test, observing that, "if the place of injury were the only test, practically no case involving a Massachusetts plaintiff would be exempt from c. 93A status, no matter how negligible the defendant's business activity in this State." *Makino, U.S.A. v. Metlife Capital Credit Corp.*, 25 Mass.App.Ct. 302, 518 N.E.2d 519, 523 (1988) (citing *Goldstein Oil Co. v. C.K. Smith Co.*, 20 Mass.App. 243, 479 N.E.2d 728, 731 n. 7 (1985)). These courts preferred either a "place of conduct" analysis, focussing on the location of the alleged conduct which violated Chapter 93A, *See Goldstein Oil*, 479 N.E.2d at 732, or a "functional approach" which "responds to the statutory concern with commercial conduct in Massachusetts." *See Makino*, 518 N.E.2d at 524.

Since the time of these decisions, the first circuit has assessed the various state court approaches in a contracts framework. Specifically, in *Clinton Hosp. Ass'n v. Corson Group, Inc.*, 907 F.2d 1260, 1263 (1st Cir. 1990), the court noted five factors which, along with those analyzed in *Bushkin*, cover "the whole range of contacts between the parties." [21]

Guided by a functional approach and the various factors enumerated by the state and federal courts [22], this court holds that the allegedly unfair or deceptive acts involved in Banamex's dishonor under the Letter of Credit did not occur "primarily and substantially" in Massachusetts. Although Boston Hides, a Massachusetts corporation with offices in Chelsea, Massachusetts, was located

---

**19.** Pursuant to Chapter 93A, Section 11:

No action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred **primarily and substantially within the commonwealth.**

Mass.Gen.Laws Ann. ch. 93A, § 11 (West 1984 & Supp.1994) (emphasis added).

**20.** In *Bushkin Associates, Inc. v. Raytheon Company*, 393 Mass. 622, 473 N.E.2d 662 (1985), the Supreme Judicial Court focussed on three factors in evaluating whether conduct occurred "primarily and substantially" in Massachusetts: (1) where the defendant committed the alleged deceptive or unfair practices; (2) the location of the plaintiff when the plaintiff acted upon the alleged deceptive or unfair statements; and (3) the situs of the plaintiff's loss.

**21.** The factors noted by the first circuit were as follows:

(1) the place of contracting;
(2) the place of negotiation of the contract;
(3) place of performance;
(4) the location of the subject matter of the contract; and
(5) the domicile, residence, nationality, place of incorporation and place of business of the parties.

*Clinton Hosp. Ass'n*, 907 F.2d at 1263.

**22.** Collectively, the applicable decisions deemed the following factors relevant to the "primary and substantially" analysis:

(1) the place of contracting;
(2) the place of negotiation of the contract;
(3) place of performance;
(4) the location of the subject matter of the contract;
(5) the domicile, residence, nationality, place of incorporation and place of business of the parties;
(6) where the defendant committed the alleged deceptive or unfair acts or practices;
(7) the location of the plaintiff when the plaintiff acted upon the alleged deceptive or unfair statements; and
(8) the situs of the plaintiff's loss.

in Massachusetts when the Banks dishonored, and incurred any alleged losses in the commonwealth, all other relevant conduct concerning dishonor occurred outside Massachusetts.[23]

 First, all parties, with the exception of Boston Hides, are foreign entities. Both Banamex and Sumitomo are foreign banks who have offices in New York. The Buyer is a Mexican corporation with its principal place of business at Prolongacion Allenda S/N, Purisima De Bustos, GTO. 36400 Mexico. Second, whether the relevant contract is between Banamex and Buyer to issue the Letter of Credit, or between Banamex/Sumitomo and Boston Hides under the Letter of Credit itself[24], all communications regarding both occurred solely between Banamex and Buyer, outside Massachusetts. Simply because Boston Hides is the beneficiary of the Letter of Credit does not establish that the Letter of Credit's contracting or negotiation took place in-State.[25]

Furthermore, the bulk of performance under either contract occurred, or was to occur, outside Massachusetts. Boston Hides, through State Street Bank, made presentment in New York to Sumitomo, and any payment thereunder was to be made by Sumitomo's New York office to Boston Hides. In addition, the subject matter of both contracts, the proceeds, were not located in Massachusetts. Payment was to be made by Sumitomo in New York from funds available at Banamex in Mexico.[26] Finally,

and perhaps most importantly, the allegedly unfair or deceptive trade practice, failure to pay under the Letter of Credit, occurred in New York and Mexico on dishonor by Sumitomo and Banamex respectively, and not in Massachusetts.

Accordingly, because virtually no conduct related to the Letter of Credit transaction occurred in Massachusetts, the plaintiff may not maintain its action under Chapter 93A.[27]

### V.

#### Conclusion

Although the Banks' dishonor, based on the trailer number discrepancy, was improper, denial of payment is nonetheless justified because of the plaintiff's submission of false documents. In addition, due to the paucity of Massachusetts conduct in the present case, the plaintiff may not maintain an action under Chapter 93A.

For the foregoing reasons, the Banks' motion for summary judgment on Counts I, II and III is hereby ALLOWED, and plaintiff's motion for partial summary judgment on Counts I and II is hereby DENIED.

23. The court notes that the Massachusetts conduct identified above is relevant primarily under the *Bushkin* "place of injury" test. As previously described, this test has been questioned because of its overbroad inclusion of Massachusetts plaintiffs. *See Makino, U.S.A.*, 518 N.E.2d at 523.

24. Although, strictly speaking, a letter of credit is not a contract but an " 'engagement' to honor drafts," *Data General Corp. v. Citizens Nat. Bank of Fairfield*, 502 F.Supp. 776, 784 (D.Conn.1980), the first circuit has observed that the letter of credit is " 'essentially a contract between the issuer and beneficiary.' " *Ground Air Transfer*, 899 F.2d at 1272 (quoting U.C.C. § 5–114, comment 1).

25. Plaintiff argues that, because the underlying contract between Boston Hides and Buyer required the Buyer to secure a letter of credit in favor of Boston Hides, the Letter of Credit was

part of the underlying sales contract. Accordingly, plaintiff maintains that, since part of the negotiation of the underlying sales contract took place in Massachusetts, negotiation of the Letter of Credit also occurred partially in Massachusetts. Any Massachusetts contacts, however, are merely a linguistic construct. No negotiations or contracting concerning the specific Letter of Credit issued by Banamex at the Buyer's request occurred in Massachusetts.

26. To the extent the Letter of Credit itself is the subject matter of the relevant contract, it was submitted by Boston Hides to Sumitomo in New York upon presentment.

27. Given this disposition, the court need not address the defendant's alternative argument that the plaintiff failed to allege conduct amounting to an unfair or deceptive act or practice under Chapter 93A.